IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

North Village Condominium
Association, Inc.,

               Plaintiff,

                                   Case No. 1:21-cv-4776-MLB

v.

Auto-Owners Insurance Company,

             Defendant.

_____/

**OPINION & ORDER**

This case comes before the Court on Defendant Auto-Owners Insurance Company's Motion for Summary Judgment (Dkt. 56). Plaintiff opposes (Dkt. 58). The Court **GRANTS** Defendant's motion.

**I.    Background**[1]

Plaintiff is a condominium association responsible for seven two-story buildings located in Decatur, Georgia. (Dkts. 1-1; 59 ¶ 1.) Defendant insured the property, including its roofs. (Dkt. 59 ¶ 3.)

---

[1] The Court derives its factual summary from facts the parties have admitted or have failed to refute or deny in accordance with Local Rule

In August 2019, Adam Hoyt with Complete Roofing Systems contacted Beverly Martin, Plaintiff's property manager, said Complete Roofing had inspected the roofs in 2017, and asked to re-inspect them. (*Id.* ¶ 12; Dkt. 57-4 at 438.) Complete Roofing conducted a drone inspection of the property on October 18, 2019 and allegedly discovered damage to the roofs. (Dkts. 59 ¶ 13; 63 ¶¶ 10, 12.) On October 23, 2019, Plaintiff filed a claim with Defendant for wind and hail damage that allegedly occurred on July 20, 2018. (Dkt. 57-3 at 224.) Defendant refers to this as Claim 1 but identified it at the time as Claim 048-0000141-2019. (Dkts. 56-1 at 2; 57-3 at 224.)

Defendant conducted its own investigation of the alleged damage. (Dkt. 59 ¶ 15.) Defendant first hired Russ Toole, an independent adjuster, to inspect the roofs by drone. (*Id.* ¶ 16.) He concluded there was hail damage. (*Id.* ¶ 17.) Defendant, however, determined Toole's inspection was incomplete and retained Dr. Jonathan Goode, a structural engineer, to re-inspect the roofs and determine the cause and extent of

---

56.1(B), NDGa. The Court has disregarded facts that are immaterial, unsupported by citations to evidence, or stated as legal conclusions. The Court also occasionally pulls facts directly from the evidence provided.

any damage. (*Id.* ¶¶ 17–19.) In the meantime, Defendant received a letter from Chad Conley, a public adjuster with U.S. Public Adjusters ("USPA") and owner of Complete Roofing, saying he represented Plaintiff. (*Id.* ¶ 20; Dkt. 56-1 at 4 n.2.)

Dr. Goode inspected the property on January 30, 2020. (Dkt. 59 ¶ 21.) He later submitted a report to Defendant, saying the roofs had sustained no hail-related damage. (*Id.*) He noted areas of circular "granule loss" but did not identify any associated bruising or fracturing of the shingle mat in these areas. (*Id.* ¶ 22.) He attributed those anomalies—not to hail damage that would be covered under the insurance policy—but to variations in weathering, inconsistencies in manufacturing, nails protruding up from the deck, deterioration from bird droppings, foot traffic, and rough handling of shingles during installation. (*Id.* ¶ 23.) Dr. Goode identified a small amount of damage—impacting only several shingles—that he attributed to wind. (Dkt. 57-9 at 67:11–17.) He provided Conley photos from the January 30, 2020 inspection. (Dkt. 57-8 at 279.)

On March 10, 2020, Toole provided Defendant an estimate totaling $834.33 for repairs to the seven damaged shingles. (Dkt. 59 ¶ 24.)

3

Because that was less than Plaintiff's deductible, Defendant sent Plaintiff an under-deductible letter, a copy of Toole's estimate, and Dr. Goode's report. (*Id.* ¶¶ 24–25.) Defendant also advised Plaintiff it was closing Claim 1. (*Id.*)

On July 7, 2020, Plaintiff filed a second claim with Defendant, claiming someone had vandalized the roofs on October 17, 2019—the day before Complete Roofing had conducted its initial drone inspection before filing Claim 1. (Dkts. 57-4 at 459, 589; 63 ¶¶ 10, 12.) Defendant refers to this as Claim 2 but identified it at the time as Claim 300-0221790-2020. (Dkts. 56-1 at 5; 57-4 at 459.) Conley sent Defendant another letter of representation. (Dkt. 59 ¶ 27.)

Defendant retained Dr. Goode to inspect the roofs again. (*Id.* ¶ 37.) He did that in October and December 2020. (*Id.* ¶¶ 38–39.) Conley attended the December 2020 inspection to show Dr. Goode the alleged vandalism. (Dkt. 57-4 at 89:22–91:1.) Before that inspection, Conley also took some of Dr. Goode's photos from the January 2020 inspection and "post-edited" or processed the photos to identify conditions or items on the roofs that Conley believed showed damage from vandalism. (*Id.* at 16:9–11, 249:1–13, 191:23–192:1, 193:9–11; Dkt. 57-8 at 277–79.) He

4

provided Dr. Goode a link to those photos at the start of the December 2020 inspection. (Dkt. 57-8 at 279.)

Dr. Goode found no evidence any of the conditions he saw resulted from mechanical contact or mechanical force—meaning they did not come from vandalism. (Dkt. 59 ¶ 40.) Dr. Goode submitted a report to Defendant, concluding the areas of missing granules "appeared to be from long-term weathering of the shingles" and that some areas "had marring or the granules and asphalt consistent with incidental foot traffic." (Dkt. 57-8 at 281–82.)

Defendant also conducted an Examination Under Oath ("EUO") of Cynthia Brinkley, the Vice President of the condominium association.[2]

---

[2] Plaintiff says Brinkley's EUO is inadmissible hearsay insufficient to support summary judgment. (Dkt. 58 at 5–7.) The Court disagrees because the statement was made by Plaintiff in a representative capacity. Fed. R. Evid. 801(d)(2)(A); (*see* Dkt. 57-3 at 23:1–18 (agreeing that Brinkley would ratify Martin's testimony so all the testimony could come from the association.) Plaintiff also appears to argue EUOs are unreliable evidence. (Dkt. 58 at 6.) Generally, an EUO is different from a deposition, and during an examination, the examinee may lack certain "safeguards" available to deponents (e.g., the formal applicability of the Federal Rules of Civil Procedure). *See Zavakos Enters., Inc. v. St. Paul Surplus Lines Ins. Co.*, 2006 WL 83502, at *6–7 (S.D. Ohio Jan. 12, 2006). But Plaintiff's counsel was present at Brinkley's EUO, so it is hard to imagine what significant steps he could have taken in a deposition but could not have taken during the EUO. (Dkt. 57-3 at 7–8.)

She explained there was no new damage to the roofs, but Plaintiff merely replaced its claim of hail damage in Claim 1 with a claim of vandalism in Claim 2:

> To my understanding, [] there was a previous claim that -- I don't know if it was denied or not. But they had to come back. And I want to say that they had to come back and change it to vandalism. We never got a clear understanding. I know what vandalism means. But I didn't see anybody get up on top of any of the roofs and take a hammer or whatever and cause damage.

(Dkt. 57-3 at 53:23–54:6.) When asked whether the damage to the structures was the same for both claims or whether she believed there was a separate event on October 17, 2019, Ms. Brinkley stated, "I'm saying, to my knowledge, it is the same damage as was previously." (*Id.* at 54:14–19.)

As part of Claim 2, Plaintiff submitted three sworn statements in proof of loss and a letter demanding payment. (Dkt. 57-4 at 563 (September 3, 2020 Sworn Statement), 576 (December 4, 2020 Sworn Statement), 589 (February 2021 Sworn Statement); Dkt. 59 ¶ 51.) Plaintiff's claim amount increased with each sworn statement, starting at $473,555.79 and increasing to $905,691.78. (Dkt. 57-4 at 563, 576,

589.) All three sworn statements asserted a loss for vandalism that occurred on October 17, 2019. (*Id.*)

On October 15, 2021, Plaintiff sued in the State Court of Gwinnett County, arguing Defendant breached the insurance contract by failing to pay for a new roof on all seven buildings (Count I) and that Defendant acted in bad faith under O.C.G.A. § 33-4-6 (Count II). (Dkt. 1-1 at 4–5; Dkt. 59 ¶ 54.) Plaintiff also seeks attorney's fees and costs under O.C.G.A. § 13-6-11. (*Id.* at 5.) Defendant removed the action and moves for summary judgment. (Dkts. 1, 56.) Plaintiff opposes. (Dkt. 58.)

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation

7

omitted).  The Court should not weigh the evidence but should determine whether there are any genuine issues of fact that should be resolved at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, the Court must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citation omitted).  But "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987).  "Inferences based on speculation and a mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quotation marks omitted).  In a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving

8

party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

## III. Discussion

The elements of a breach of contract claim are "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (2013) (citing *Norton v. Budget Rent A Car Sys.*, 307 Ga. App. 501, 502 (2010)).

The policy Defendant issued to Plaintiff has a so-called "suit limitation provision" that states: "[n]o one may bring a legal action against [Defendant] under this insurance unless . . . [t]he action is brought within 2 years after the date on which the direct physical loss or damage occurred." (Dkt. 1-1 at 137.) Under Georgia law, a suit limitation provision in an insurance contract is valid and enforceable. *See, e.g.*, *Brookins v. State Farm Fire & Cas. Co.*, 529 F. Supp. 386, 392 (S. D. Ga. 1982); *Little v. Allstate Ins. Co.*, 258 Ga. 404, 404 (1988). A suit limitation provision starts running from the date of the incident or loss, not the date the insurer receives proof of the loss. *See SunTrust Mortg., Inc. v. Ga. Farm Bureau Ins. Co.*, 203 Ga. App. 40, 42 (1992). And if the suit

limitation provision applies, it bars a plaintiff's breach-of-contract claim because it arises from the policy. *See McCoury v. Allstate Ins. Co.*, 254 Ga. App. 27 (2002).

Plaintiff filed suit on October 15, 2021. So it may only recover for losses that occurred on or after October 15, 2019. Defendant argues it is entitled to summary judgment on Plaintiff's breach-of-contract claim because Plaintiff cannot show the physical damage occurred within the suit limitation provision set forth in the policy. (Dkt. 56-1 at 10–15.) Despite having denied Claim 1 based on Dr. Goode's conclusion that the damage identified did not result from a hailstorm, Defendant now says the loss at issue in Claim 2 "related to a hail event which occurred on July 20, 2018 . . . ." (Dkt. 56-1 at 11–12.) Defendant argues that, even if it "made the wrong decision in Claim 1 regarding the nature of the damage to Plaintiff's roof, Plaintiff is legally barred from seeking recovery for this damage." (*Id.* at 12.) Defendant argues that Plaintiff's reclassification of the alleged damage from hail to vandalism (that is, from Claim 1 to Claim 2) did not restart the clock for purposes of the suit limitation provision since the two claims sought recovery for the same damage. (*Id.* at 14.) In support, Defendant points to Brinkley's

10

examination in which she admitted that, to her knowledge, the damage to the roofs asserted in the vandalism claim (Claim 2) was the same damage as had been reported in the hail claim (Claim 1). (Dkt. 57-3 at 54:14–19.)[3]

Plaintiff says the loss occurred on October 18, 2019, when the alleged vandalism occurred, making its claim timely by 3 days. (Dkt. 58 at 10.)[4] Plaintiff offers no evidence that anything happened on that day. That was merely the day on which Complete Roofing conducted its drone inspection. But Plaintiff says that, in the fall of 2019, a company known as Ameristar had been on Plaintiff's roofs to make certain repairs. Plaintiff points to Conley's deposition testimony that, after Dr. Goode inspected the roofs (as part of Defendant's investigation of Claim 1) and

---

[3] Defendant identifies three other statements that provide similar admissions. The Court finds its unnecessary to consider all three, especially given that counsel was not present at Alisha Bowman's EUO; it's unclear whether Martin's testimony binds Plaintiff; and Defendant does not explain how Ryan Brown's hearsay-within-hearsay statement could be made admissible.

[4] As explained, Plaintiff alleges the vandalism occurred on October 17, 2019 and that it discovered the damage on October 18, 2019. But during the hearing discussed below, Defendant agreed not to hold Plaintiff to that allegation, allowing for the damage on the day of the discovery. (Dkt. 70.)

identified circular surface anomalies, he obtained the photos from Dr. Goode and "Ameristar Roofing confirmed that the anomalies [in Dr. Goode's photos] were not present on Ameristar Roofing's prior visits." (Dkt. 58 at 2.) Plaintiff cites testimony from Conley that Martin contacted Ameristar Roofing to ask whether it had seen the type of damage Dr. Goode identified when it had worked on Plaintiff's roofs prior to Dr. Goode's visit. (*Id.* (*citing* Dkt. 57-4 at 171:19–172:7).) Ameristar Roofing was "insistent that they had never seen it there before." (Dkt. 57-4 at 171:8-9.) Plaintiff adds that "Conley believes that Ameristar Roofing, when they came out to look at Plaintiff's property, would be looking for damages that could be covered under an insurance policy." (Dkt. 58 at 3.) Plaintiff also points to testimony from Maria Kemp, Ameristar's corporate representative, that "if Ameristar had one of its representatives or [] subcontractors out on a roof, and [they] notic[ed] widespread damage or issues with the roof, [that] would [] be something that Ameristar would report back to the property manager or the property management company." (Dkt. 64-1 at 20:11–18.) From this, Plaintiff essentially sets a window, alleging the damage occurred after

12

the day Ameristar made unrelated roof repairs but before Complete Roofing's drone inspection on October 18, 2019.

There are two problems with Plaintiff's logic. First, Plaintiff did not identify the date on which Ameristar worked on the roof. Without that date, Plaintiff could not present evidence that the damage occurred during the relevant three-day window. Wanting to allow Plaintiff an opportunity to identify this evidence, the Court held a hearing. The parties agreed that, for Plaintiff's timeline to work, it would have to show that the vandalism occurred after October 15, 2019 (to fall within the 2-year suit limitation provision) but before October 18, 2019 (when Plaintiff allegedly discovered the damage). Plaintiff agreed that Ameristar conducted only one repair before October 18, 2019—specifically on September 24, 2019. (Dkt. 70; Dkt. 64-1 at 121–127.) Of course, that means the damage could have happened at any time between September 24 and the start of the limitations period. Plaintiff argued that it is entitled to an inference that its claim is timely because a jury *could* find that the alleged loss happened after October 15, 2019. Plaintiff is only entitled to an inference that the loss occurred between September 24 and October 18, 2019. Plaintiff has presented no

13

evidence from which a jury could conclude that, within that timeframe, it occurred after October 15, 2019. An inference must be based on a fact—a fact from which a jury could reach a logical conclusion. Without such a foothold, a jury cannot simply speculate or wildly guess. *Melton*, 841 F.3d at 1219; *Rollins*, 833 F.2d at 1529. Plaintiff's own rubric presents no evidence from which a jury or the Court could determine its claim is timely.

Second, no evidence supports Conley's opinion that Ameristar would be looking for evidence of other damage while making repairs to the roof. This is important because Plaintiff's entire theory depends on Conley's assumption or conclusion that the damage Dr. Goode observed in January 2020 must have occurred *after* Ameristar's prior work because Ameristar did not notice it at the time. Conley's testimony shows Plaintiff's lack of evidence in this regard. He testified he never spoke with Ameristar about this issue as he understood Martin did so. (Dkt. 57-4 at 172:3–9.) When asked whether he knew if anyone asked Ameristar to inspect the roof "for any sort of damage" while they were making repairs, he made it clear he had no actual knowledge about this. He said it was his "understanding that when [Ameristar] c[a]me out and

14

d[id] their maintenance work that that's part of what they look for, but [Martin] would have to speak to that." (*Id.* at 173:19–23.) Defendant asked whether he had asked Ameristar if "that would be within the scope of what they're asked to do," and Conley said, "[w]ell, that's what [Martin] specifically asked them. She specifically asked them if they [] documented any of that." (*Id.* at 173:24–174:4.) Defendant then asked Conley whether he had "any sort of position" he was taking as to "whether or not Ameristar would have identified this type of condition on the roof system [wa]s an assumption on [his] part[.]" (*Id.* at 175:13-18.) Conley made it clear that he never asked them to do it, never talked to them about having done it, and does not know whether they were asked to do it. (*Id.* at 175:18–176:13.) A fair reading of Conley's testimony shows that he assumed Ameristar would have been looking for other damage but never confirmed that fact. And Plaintiff apparently never asked Martin whether she made this inquiry of Ameristar or at least cites no such testimony.[5]

---

[5] Interestingly, Plaintiff has been seeking this assurance from Ameristar since at least July 2020. When Plaintiff decided to file a police report claiming vandalism, Hoyt emailed Martin, telling her to find the "name and contact information of [the] roof repair company that did the last

15

Kemp's testimony also contains insufficient evidence from which a jury could make an inference favorable to Plaintiff's argument. Kemp testified that Ameristar was aware of Plaintiff's pending insurance claim but was unaware of the actual damage at issue in the claim. (Dkt. 64-1 at 5–14.)  Martin asked Ameristar to make "temporary repairs" on the roof unrelated to the insurance claim. (Dkt. 64-1 at 76:15–17.) Kemp explained that "*if* Ameristar had . . . notic[ed] widespread damage or issues with the roof," it would have reported such damage back to Plaintiff. (*Id.* at 20:11–18 (emphasis added).) No evidence, however, suggests the damage Dr. Goode saw in January 2020 was the type of damage she thought Ameristar might notice. (*See e.g.*, *id.* at 54 ("I can't guarantee that he would have seen [] damage [to the shingles] if he was

---

repair prior to 10/18/2019." (Dkt. 57-3 at 242.) He explained "the reason for this is so we can put on the police report first that there WASN'T any damage/vandalism reported when the roofer was up there (because he would have seen it.)" (*Id.*) He also explained "this helps you prove to the insurer that this wasn't pre-existing damage from something before your policy covered you." (*Id.*) He ended his email saying, "this doesn't put your roofer in any kind of jeopardy: if he'd seen the damage he would have reported it, that's all we are saying." (*Id.*) That Plaintiff sought this assurance years ago and yet provided no such evidence at summary judgment, speaks volumes as to the lack of any factual basis for Conley's assumption that Ameristar would have notified Plaintiff if it had seen other damage while making repairs.

16

just going out for a leak . . . .") Plaintiff did not show her Dr. Goode's photos, describe the damage to her, or ask whether it was the type of damage Ameristar might have noticed. (*See generally id.*) There simply is no evidence from which a jury could conclude Ameristar would have noticed or reported the type of damage at issue in the vandalism claim. In addition, Plaintiff presented no evidence Ameristar made repairs in any of the areas in which Dr. Goode noticed the damage. A roof may be a roof. But that is not enough here; this case involves seven roofs. So the fact Ameristar went on some roof to make specific repairs provides no evidence from which a jury could conclude Ameristar went to the area in which the alleged vandalism occurred.

Plaintiff is entitled to all reasonable inferences from the evidence. But, again, Plaintiff must establish at least a toehold of evidence from which a jury could make a logical leap to facts favorable to Plaintiff's timeline. Without even trying to establish either that the alleged vandalism damage was the type of damage Ameristar would have reported if it had seen it or that Ameristar made repairs anywhere near the vandalism damage, Plaintiff presents no foundation from which a jury could infer that, since Ameristar made no such report, the damage

17

occurred after Ameristar made the repairs. Even if they could clear that hurdle, Plaintiff presents no evidence from which a jury could conclude the damage happened on or after October 15, 2019, considering the undisputed evidence shows Ameristar made the repairs 21 days before. Plaintiff asks too much of its entitlement to reasonable inferences. No reasonable jury could conclude from Plaintiff's evidence that the alleged loss occurred within the applicable timeframe such that Defendant breached the insurance contract by failing to cover the loss. For a jury to close the gaps in Plaintiff's evidence, it would have to simply guess, and Plaintiff is not entitled to that.[6]

---

[6] Defendant also requests summary judgment on Plaintiff's bad-faith insurance claim under § 33-4-6 and request for fees and costs under § 13-6-11. Plaintiff did not respond. (*See* Dkt. 58.) So the Court also grants Defendant summary judgment on these claims. *Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."). In any event, the Court finds these claims fail on the merits. First, Defendant based its coverage position on inspections by its own expert, so its decision to reject Plaintiff's demand under § 33-4-6 was reasonable. *Montgomery v. Travelers Home & Marine Ins. Co.*, 859 S.E.2d 130, 135 (Ga. Ct. App. 2021) ("As a matter of law, it is reasonable for an insurer to deny a claim based on [an independent consultant's] advice unless the advice is patently wrong and the error was timely brought to the insurer's attention, . . . or unless the advice [was pretextual]."). Second, the

## IV.  Conclusion

The Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 56).

**SO ORDERED** this 8th day of March, 2024.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

exclusive remedy for bad-faith breach of an insurance contract is set forth in § 33-4-6. *Anderson v. Georgia Farm Bureau Mut. Ins. Co.*, 566 S.E.2d 342, 345 (Ga. Ct. App. 2002).

19